| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | WESTERN DISTRICT OF LOUISIANA |
| 3 | MONROE DIVISION |
| 4 | |
| | UNITED STATES OF AMERICA            ) |
| 5 | ) |
| | VS.                                 )   CRIMINAL ACTION |
| 6 | ) NO. 3:22-CR-00267 |
| | ROBERT SCOTT BROWN, JR.             ) |
| 7 | _____ ) |
| 8 | |
| 9 | MOTION TO SUPPRESS HEARING |
| | OFFICIAL TRANSCRIPT OF PROCEEDINGS |
| 10 | BEFORE THE HONORABLE KAYLA D. McCLUSKY |
| | UNITED STATES MAGISTRATE JUDGE |
| 11 | JUNE 7, 2023 |
| | MONROE, LOUISIANA |
| 12 | APPEARANCES: |
| 13 | FOR THE GOVERNMENT: |
| | AUSA JESSICA CASSIDY |
| 14 | U.S. Attorney's Office |
| | 300 Fannin Street, Suite 3201 |
| 15 | Shreveport, LA 71101-3068 |
| 16 | FOR THE DEFENDANT: |
| | LAVALLE B. SALOMON |
| 17 | Attorney at Law |
| | P.O. Box 14596 |
| 18 | Monroe, LA 71207 |
| 19 | |
| 20 | |
| 21 | Produced by mechanical stenography, transcript produced by |
| | computer. |
| 22 | |
| | DIANA CAVENAH, RPR |
| 23 | FEDERAL OFFICIAL COURT REPORTER |
| | 300 FANNIN STREET, SUITE 4209 |
| 24 | SHREVEPORT, LOUISIANA 71101 |
| | (318) 934-4754 |
| 25 | |

1                        C O N T E N T S

2

3     WITNESSES FOR THE GOVERNMENT:                      Page

4     TESTIMONY OF BRIAN LEVINE, PH.D.:
           Direct Examination by Ms. Cassidy            7
           Cross-Examination by Mr. Salomon             321
5

6     TESTIMONY OF SPECIAL AGENT WILLIAM SCULLEN:
           Direct Examination by Ms. Cassidy            34
7          Cross-Examination by Mr. Salomon             52
           Redirect Examination by Ms. Cassidy          54
8

9     TESTIMONY OF SERGEANT JAMES HUMPHREY:
           Direct Examination by Ms. Cassidy            56
10         Cross-Examination by Mr. Salomon             65
           Redirect Examination by Ms. Cassidy          70
11

12                        E X H I B I T S

13    Exhibit No.                  Offered        Admitted
      Government Exhibit 1           11              11
14    Government Exhibit 2           28              28
      Government Exhibit 3           30              30
15    Government Exhibit 4           42              42
      Government Exhibit 5           46              46
16    Government Exhibit 6           62              62

17

18

19

20

21

22

23

24

25

1          (Court called to order with the defendant present at

2     10:01 a.m.)

3               THE COURT:  We are here today in the case of

4     United States of America versus Robert Scott Brown, Jr.

5     That's case number 3:22-00267 and we are here today for a

6     motion to suppress hearing.  Counsel, do you want to make

7     your appearances for the record?

8               MS. CASSIDY:  Yes, Your Honor.  Good morning.

9     Jessica Cassidy on behalf of the government.  I would point

10    out that seated with me at counsel table is --

11              THE COURT:  Yes.

12              MS. CASSIDY:  -- Jeff Goodwin.  He is our summer

13    intern.

14              THE COURT:  Okay.

15              MS. CASSIDY:  If the Court would not mind him

16    sitting in.

17              THE COURT:  I do not mind at all.  We are happy to

18    have you, Mr. Goodwin.  And I hope if there is anything we

19    can help you with about learning about federal practice,

20    we're happy to do that.

21              MS. CASSIDY:  And then also seated at counsel

22    table is the case agent, FBI Special Agent Jonathan Capers.

23              THE COURT:  Thank you very much.

24              MR. SALOMON:  Val Salomon, Your Honor.  I'm here

25    on behalf of Mr. Brown who is also present.

1          THE COURT:  All right.  Ms. Cassidy?

2          MS. CASSIDY:  Your Honor, our first witness will

3    be Professor Brian Levine.  I have two other witnesses and

4    at this time I'd tell the Court I've advised him of the

5    rule of sequestration and they can sit in the witness room,

6    if it's agreeable.

7          THE COURT:  That is --

8          MR. SALOMON:  That's fine.

9          THE COURT:  -- certainly how we normally do it, so

10   let's go ahead and proceed with the first witness.

11         MS. CASSIDY:  All right.

12         MR. SALOMON:  Your Honor, I have spoke to

13   Ms. Cassidy and --

14         THE COURT:  Okay.  Before we proceed any further,

15   the court reporter has asked that you guys make sure you're

16   talking into your microphone.  She is having trouble hearing

17   you guys and maybe me, too.  I'll try to do my best, too.

18         MR. SALOMON:  I spoke to Ms. Cassidy and I think

19   we both agree that two-thirds of my motion deal with bare

20   bones and staleness, which simply is argument based upon the

21   four corners of the warrant, and then we'll decide whether

22   we -- whether there's going to be any witness testimony

23   regarding the third aspect of my argument.

24         THE COURT:  All right.  So you're only going to

25   provide testimony on that third aspect; is that what you're

1    saying?

2            MR. SALOMON:  Yes.  That one there may be some

3    testimony, maybe not.

4            THE COURT:  Okay.

5            MR. SALOMON:  Because I've gotten some further

6    information and it probably answers my questions, quite

7    candidly.

8            THE COURT:  Okay.  Well, if at any point we don't

9    need further testimony, then you let us know, Mr. Salomon.

10            MR. SALOMON:  I'm sure you'll be heartbroken.

11            THE COURT:  Yeah.

12        All right.  In that case, Ms. Cassidy, if you want to

13    proceed with your first witness.  Is there anything else we

14    need to address?

15            MR. SALOMON:  Just argument right now if we're --

16            THE COURT:  Oh, you want to make argument right

17    now?  I'm sorry.

18            MR. SALOMON:  Just regarding the three aspects.

19            THE COURT:  Okay.

20            MR. SALOMON:  One is bare bones argument of the --

21    with the state warrant that was involved here, which would

22    be within the four corners of the warrant, nothing beyond.

23            THE COURT:  Right.

24            MR. SALOMON:  And then a staleness argument was

25    also with the four corners of the warrant, so that -- it's

1   argument only.

2          THE COURT:  Okay.

3          MS. CASSIDY:  And, Judge, and I apologize, I agree

4   with Mr. Salomon that part of that is argument.  I didn't

5   know if maybe it would be better to save those arguments for

6   at the end of the hearing, only because of the good faith

7   exception and how that's the first thing that courts look to

8   with regard to allegations of bare bones affidavits.

9          THE COURT:  Right.  That's what -- I thought we

10   were going to take testimony first and then y'all can make

11   any argument --

12          MR. SALOMON:  Whichever.

13          THE COURT:  -- you want to make.

14          MS. CASSIDY:  Why don't we do that.  If it's

15   agreeable, let's do that.

16          MR. SALOMON:  Okay.  That's fine.

17          THE COURT:  Okay.  Yeah.  I misunderstood.  I

18   thought that's what we were doing.

19          MS. CASSIDY:  Okay.  Mr. Levine.

20          THE COURT:  We really do need you now.

21          THE WITNESS:  Good morning, Your Honor.

22          (Witness sworn.)

23          MS. CASSIDY:  And, madam court reporter, if you

24   could go ahead and turn on the screen.  I know we'll need it

25   for his testimony.

<u>BRIAN LEVINE, PH.D.</u>

having been first duly sworn to testify the truth, the whole

truth, and nothing but the truth, testified as follows:

<u>DIRECT EXAMINATION</u>

BY MS. CASSIDY:

Q    Good morning.

A    Good morning.

Q    Would you state and spell your name for the record?

A    My name is Brian Levine.  B-R -- B-R-I-A-N.  Levine,

L-E-V-I-N-E.

Q    Are you currently employed?

A    I am.

Q    Where are you employed?

A    The University of Massachusetts in the College of

Information and Computer Sciences.

Q    How long have you been employed by the University of

Massachusetts?

A    Since 1999.

Q    What's your title or your position?

A    Professor.

Q    Is that a tenured position?

A    It is.

Q    When did you receive tenure?

A    2005.

Q    Do you have any particular subject matters that you

1    specialize in?

2    A    Yes.  Since I've been there, I've been specializing in

3    networks and security, privacy and forensics.

4    Q    Do you teach any courses related to those subject

5    matters?

6    A    I do.

7    Q    What are some of the courses that you teach?

8    A    Most recently, I've been teaching a course on digital

9    forensics.  In the past I have taught courses on computer

10   networks, intro to security, introduction to programming, a

11   variety of graduate-level seminars on the latest research.

12   A lot of these are listed in the CV.  All of them --

13       (Off the record.)

14       Graduate-level seminars on the latest research is what

15   I believe I said.

16   Q    (BY MS. CASSIDY) And you alluded to this in your last

17   response, but at what academic levels are these courses?

18   A    Both at the undergraduate and the graduate level.

19       MS. CASSIDY:  Mr. Goodwin, can you pull up

20   Government Exhibit 1?

21   Q    (BY MS. CASSIDY) And, Professor Levine, do you

22   recognize what this document is?

23   A    I do.  It's my CV.

24       MS. CASSIDY:  Mr. Levine -- or I'm sorry.

25   Mr. Goodwin, if we could scroll down to the bottom of page

1.

Q     (BY MS. CASSIDY) Professor Levine, if you would just describe your educational background.

A     Yes.  My undergraduate degree is from what's now called the University at Albany but was called the State University of New York at Albany.  I graduated in 1990 with a degree combined in Applied Mathematics and Computer Science.  And from there, I went to graduate school at the University of California, Santa Cruz, where I received a master's degree and subsequently a Ph.D. in Computer Engineering, and my research focused on the internet, broadly speaking.

          MS. CASSIDY:  And, Mr. Goodwin, if you would just toggle over through pages 3 through 8.  And stop right there.  I apologize, Mr. Goodwin.

Q     (BY MS. CASSIDY) Starting here -- and, Professor, you know you are seeing it better than anyone, but over the course of these next few pages, do these discuss your peer-reviewed papers?

A     It does.

Q     Do many of these papers relate to computer forensics and child exploitation?

A     They do.

          MS. CASSIDY:  And, Mr. Goodwin, if we could go back to page 2 of the CV.  Thank you.

1    Q    (BY MS. CASSIDY) Professor Levine, I have noted

2    something on the screen, "2020 ACM Fellow."  Can you

3    explain what that is and what it relates to?

4    A    Yes.  So the ACM is a professional society.  It stands

5    for the Association for Computing Machinery.  It's a society

6    that I believe it started in the 1940's.  It's a -- it's a

7    professional society for people who research and are

8    practicing computer scientists, and they have different, I

9    guess you might call it, status levels, so this is the

10   highest status level called a fellow.  And as you can read

11   there, it's based upon a nomination and review process by a

12   distinguished selection committee and this status is

13   reserved by -- I guess "bylaws" would be the words of the

14   society -- bylaws for the -- for just one percent of the

15   total membership of the society.  And when you're elected a

16   fellow, and I was, there is a specific sentence there --

17   citations, I think, is the better word for why you become a

18   fellow.  And so, for me, these were contributions to my work

19   in forensics, security, and privacy and for thwarting crimes

20   against children.

21   Q    Thank you.

22        MS. CASSIDY:  And, Mr. Goodwin, lastly, will you

23   turn to page 8 of the CV?  Right there.  Thank you.

24   Q    (BY MS. CASSIDY) Professor Levine, have you been

25   qualified to testify as an expert witness previously?

1    A    Yes.

2    Q    And are all of those expert testimony and where they

3    were located, is that reflected in your CV?

4    A    Yes, it is.

5    Q    Fair to say, without reading out the various courts,

6    that you've been qualified as an expert witness in numerous

7    federal district courts?

8    A    Correct.

9         MS. CASSIDY:  Your Honor, at this time the

10   government would move into evidence Government Exhibit 1.

11        THE COURT:  Any objection?

12        MR. SALOMON:  No objection, Your Honor.

13        THE COURT:  Okay.  That's received into evidence.

14   Q    (BY MS. CASSIDY) And, lastly, Professor Levine, what

15   have been some of the areas in which you were qualified as

16   an expert witness?

17   A    Peer-to-peer networking and network security, computer

18   science and forensics.  I'm just reading off the list here.

19   Digital forensics.

20        MS. CASSIDY:  Your Honor, at this time the

21   government would tender Professor Levine as an expert

22   witness in the field of networking and digital forensics.

23        THE COURT:  Networking and digital forensics;

24   is --

25        MR. SALOMON:  Yeah, I have no --

1          MS. CASSIDY:  -- that what you said?  Do you have

2   any objection?

3          MR. SALOMON:  No objection.

4          THE COURT:  No objection?

5          MR. SALOMON:  No.

6          THE COURT:  Okay.  Then I do find him qualified in

7   the field -- so say it one more time for me.

8          MS. CASSIDY:  I apologize, Your Honor.

9   Networking and digital forensics.

10         THE COURT:  Networking and digital forensics.

11         THE WITNESS:  Thank you, Your Honor.

12  Q    (BY MS. CASSIDY) Professor Levine, my intention of your

13  testimony today is to provide the Court with an overview of

14  various topics.  So, with that said, can you provide an

15  overview of what is peer-to-peer networking and how it

16  works?

17  A    So peer-to-peer networking -- if you don't mind, let me

18  first define it by what it's not.  More commonly, all of

19  us -- at this point, probably everyone here has a cell phone

20  or a computer they use regularly, and I think we're used to

21  using what's often called a client server.  So a good

22  example of that would be, say, Netflix or Spotify, if you

23  use those services, and, again, at a very high level, in

24  those cases, we, as users, are clients, and we contact a

25  central location called a server, sometimes often called a

1    web server, or something out there in a warehouse, which is

2    commonly called the cloud, and we will contact Netflix and

3    stream a movie down, and another person who has subscribed

4    to Netflix will contact, as the client, the Netflix server

5    and stream a movie down, but what we won't do, typically in

6    this model, is contact other Netflix subscribers for any of

7    that movie.  The same thing with Spotify and other streaming

8    services.  So peer to peer is a different approach.  There

9    is no central server that someone has set up as part of the

10   company or an organization.  Instead, there are just other

11   peers is the word.  And peers are people who have downloaded

12   software, say, and they run that software.  And to get

13   content from this peer-to-peer network, as it's called,

14   they will contact the other peers using this software and

15   say I'm looking for this particular music or movie, can you

16   give me, say, a part of it, and I will ask other peers for

17   the rest of the movie.

18   Q    And thank you for that explanation.  Are you familiar

19   with a software program known as Freenet?

20   A    I am.

21   Q    Have you researched Freenet?

22   A    Yes.

23   Q    Have you even written published papers about Freenet?

24   A    I have.

25   Q    Is Freenet a peer-to-peer network program?

1  A    It is.

2  Q    What is the purpose of Freenet?

3  A    Freenet has a few purposes.  I think at the highest

4  level, the goal is to share content among peers -- in other

5  words, among people -- who have also downloaded and are

6  running Freenet.  It has some other purposes.  They would

7  like their content to remain available for a long time and

8  they would like some modicum of privacy in terms of who has

9  made that content available and who is currently downloading

10 that content.

11 Q    And when we say "content," do we mean like files?

12 Images?  Videos?

13 A    All of those -- anything you can make into a computer

14 file, it could potentially be shared in Freenet.  So, yes,

15 that includes videos, images, and so on.

16 Q    How does one access Freenet?

17 A    It's freely available.  For example, you could just go

18 to Google or your favorite search engine and type "Freenet

19 Project," for example.  You know, I would expect it would

20 appear among the first hits.  You'll end up at their web

21 page.  And from the web page, you'll notice a download link,

22 and then that software is free to download.  There is no

23 registration, not even free registration.  You can just

24 click the download link, and then it's available on your

25 computer at no charge.

1   Q    Are you familiar with the term "open source software"?

2   A    I am.

3   Q    What does that mean?

4   A    So it means -- so all software has been created from

5   some source code is what we call it.  It's what's been typed

6   into the computer by a programmer.  And then there is a

7   process by which the programmer compiles that into a single

8   executable.  And most often when we purchase software, we

9   just get that little executable that we can double click.

10  But with open source software, you can actually download and

11  inspect the original source code, the programmer's work,

12  that went into it.

13  Q    And so is it fair to say that you can modify that

14  source code?

15  A    Absolutely.

16  Q    Is Freenet an open source software?

17  A    It is.

18  Q    What happens when a person downloads Freenet?

19  A    So once you download it and you begin to execute the

20  installation program, it will run through what's commonly

21  called a wizard, a configuration wizard.  You may not have

22  heard that term, but it's when you install software and you

23  keep hitting next, next, next.  And so the configuration

24  wizard will run, you'll select various options, and when

25  you're done with it, if everything worked out okay, you'll

1    be able to finally just run the program and, ideally, not

2    run that installation step ever again.

3    Q    Are you familiar with the terms "open net mode" and

4    "dark net mode"?

5    A    Yes.  So, in particular, for Freenet, during that

6    configuration stage, during the configuration wizard, while

7    you're installing it, it will ask you to make several

8    decisions.  One of the decisions is whether you would like

9    to run in what's called open net mode or dark net mode.

10   Q    And can you explain the different modes to the Court?

11   A    So with dark net mode -- I'll start there -- the idea

12   is that you are aware of someone else who is also running

13   Freenet.  You could be friends with them at work.  You might

14   have met them online in a forum and never actually met them

15   in person.  But with dark net mode, you tell the software --

16   I'll just call them your "friend" -- this is my friend and I

17   would like my computer to connect to their running instance

18   of Freenet.  And if dark net -- the intention of dark net

19   mode is that you are only connected to these friends.

20        Now, with open net mode, you are connecting to

21   strangers and I use the word "stranger" because on the

22   installation screen, it says in open net mode, you will

23   connect to, quote, "strangers."  So this is probably more

24   common because most people don't know anyone running

25   Freenet.  It's not the world's most popular software, like,

1    say, Spotify or Netflix, and the software will do this work

2    behind the scenes to find these other strangers from your

3    Freenet and they become your direct peers or neighbors,

4    sometimes they are called.

5    Q    And we'll get into the specifics in a minute of how

6    open net versus dark net works with regard to file sharing,

7    but I did want to ask you, when you download Freenet, are

8    you allocating a portion of your hardware space?

9    A    Yes.  That is one of the questions during the

10   configuration process, how much of your hard drive space

11   would you like to reserve for Freenet to use.

12   Q    And so can you explain then -- and use me for an

13   example, I have downloaded Freenet onto my computer.  I

14   reserved a portion of my hard drive.  What does that mean

15   for purposes of Freenet?

16   A    Well, so, remember, as I said, one of the differences

17   between client server, like Netflix and Spotify, in a

18   peer-to-peer system is that the content that you would like

19   to retrieve is held with other peers.  So when you run

20   Freenet, you, yourself, run Freenet, and you reserve that

21   space, it will start to be filled up with content that has

22   been inserted by others using Freenet.

23   Q    And is it -- let's say another user uploaded a file on

24   Freenet.  Am I receiving that whole file in my allocated

25   space?

1   A     No.  And if you are familiar with other peer-to-peer

2   systems, this is one of the differences with Freenet.

3   But, if you're not, in short, as you said, when I insert

4   something into Freenet to make it available to others,

5   everyone else who is running Freenet will get a small

6   fraction of that entire file.  So maybe what you're seeing

7   is -- I'll leave it at that.

8   Q     So with regard to open net mode, these strangers are

9   getting randomly anybody's pieces of a file?

10  A     Correct.

11  Q     So what process -- and you alluded to it with the

12  pieces, but what process takes place when someone uploads a

13  file onto Freenet?

14  A     So, at a very high level, ignoring a tremendous number

15  of details, I will be running the Freenet software.  I will

16  use the software to -- I will say I would like to upload

17  something now, and it will say please locate, let's say, a

18  video on your hard drive that you would like to share with

19  the rest of the world who is running Freenet.  And, again,

20  at a high level, you can think of it as the software will

21  smash it into pieces, sometimes they're called blocks, and

22  then these blocks will be scattered around the world to

23  everyone who is running Freenet.  Again, not all blocks to

24  every person.  Some blocks with one person running Freenet,

25  and some blocks with another person running Freenet.  And

1    that -- yeah, I'll leave it at that.

2    Q    And then once the file is uploaded and broken, is it

3    encrypted?

4    A    Yes.  Well, to be clear, it's encrypted before it's

5    uploaded to others.  And so that way -- you know, in your

6    example, you were running Freenet.  You donated the space.

7    The software will store, as that content, little blocks of

8    files that have been inserted by others and you'll receive

9    those blocks in an encrypted state.

10   Q    And then is there some type of key or something

11   associated with the file so that it can be retrieved?

12   A    Yes.  So backing up, I said if I would like to share a

13   video on Freenet, I will smash the file into pieces.

14   Encrypted versions of those blocks of pieces will be

15   uploaded to others.  And when the software is done with

16   that, and if it's successful, it will say here is what's

17   called a key.  The full term is a manifest key.  It looks

18   very similar to a URL.  If I were to point you towards an

19   article in the New York Times, I would give you a full URL.

20   I think we have seen sometimes URLs can get very long and

21   unwieldy.  The Freenet -- and I'll just use the word "URL"

22   right now -- the Freenet URLs are much longer, full of

23   random characters, but, at a high level, what they contain

24   is where to start to get the list of blocks that you would

25   like to retrieve to recreate this video that someone else

1   has uploaded, and the other part of it is the password, the

2   decryption password.  So as a user of Freenet, you are

3   storing blocks that are encrypted, but as a downloader of

4   Freenet you have the key to decrypt them and, as I said, you

5   have -- you know where to go to get the list of blocks that

6   you need, the manifest of blocks that you need.

7           THE COURT:  Let me ask this question -- and you

8   might be getting to this, Ms. Cassidy, so I'm not trying to

9   jump in where you are --

10          MS. CASSIDY:  No.  Go ahead, Your Honor.

11          THE COURT:  -- but I'm trying to make sure I

12  understand, though, because all those details I wouldn't

13  understand, and I appreciate you leaving some of those

14  details out, but --

15       So when it breaks -- so when Freenet breaks it into

16  blocks or the user breaks it into blocks, the person who has

17  the key and who wants to download, they can eventually get

18  the whole video?

19          THE WITNESS:  Correct.

20          THE COURT:  One block at a time or something?

21          THE WITNESS:  Correct, Your Honor.

22          THE COURT:  Okay.

23          MS. CASSIDY:  And that was my next area.

24          THE COURT:  Okay.  I was afraid I was jumping you.

25  I'm sorry.

 1            MS. CASSIDY:  No, I appreciate it, Your Honor.

 2   Q    (BY MS. CASSIDY) Professor Levine, provide the Court

 3   with a 100-point view of how a file is retrieved and what

 4   that entails.

 5   A    May be 100,000-foot view, though.

 6   Q    Okay.  That's fine.

 7   A    For downloading the file and what it entails is what

 8   you said?

 9   Q    Yes.

10   A    So I said a little bit of this.  So I am running the

11   Freenet software.  I have been given, I'll call it, this

12   URL for what I would like to download.  I give this to the

13   software.  The software retrieves a manifest list of what's

14   in there.  You can think about -- the word "manifest" is

15   very appropriate.  It's a word we use for the contents of a

16   ship.  I'd like to think of this as a little bit similar to

17   IKEA.  If I go to IKEA, there is just thousands of parts to

18   it.  A desk I need to reconstruct, it will come with a list

19   of parts that I should have if I am going to construct the

20   desk appropriately.  So similarly here, the software will

21   download these list of blocks.  If you download enough of

22   them, then you can decrypt them and reconstruct the original

23   video and then it's yours to view or do what you want with

24   it.

25   Q    And with regard to when you input this manifest, is

1    Freenet then going out and searching peers?

2    A    Okay.  So that's another level of detail.  So, as I

3    said before, when you join the net -- when you install the

4    software and you run it, we talked about connecting to

5    strangers, and there is a process where you can think of it

6    as arbitrarily finding other people on the internet running

7    the Freenet software.  And what I will say is I have a

8    direct connection to them.  And what I mean by that is

9    imagine you're in a room of a thousand people, you can't

10   have everyone talking at once.  And if you need all thousand

11   people to communicate with one another, what they'll do is

12   just talk to the, let's say, 10 people around you in the

13   room and ask them to relay messages to other people in the

14   room.  Otherwise it's too hard to keep track of that many

15   people at once.

16        So, similarly, in Freenet, a user who is downloading a

17   file has this list of blocks they would like to request from

18   others and they're not going to request it from all thousand

19   peers or many thousand peers running Freenet, they're going

20   to request it of just the 10 neighbors or strangers that

21   they have been connected to.  So their software will ask the

22   software of their neighbor do you have this block, and that

23   is a request that is intended for that neighbor, and if you

24   have it, you can respond and give it to me.

25        And, further, the way Freenet works is they say when

1    your computer makes this request to this other user, the

2    request says, if you have it, please respond, but if not,

3    ask your neighbors.  And so, hop by hop, you might say, the

4    request will go from one neighbor to one of their neighbors.

5    And either it will succeed and make its way back to the

6    original requester from these relaying neighbors, or it will

7    fail, in which case, a little while later you might say that

8    didn't work for me and I may ask another neighbor do you

9    have this request.  And, eventually, if enough requests

10   succeed, then I can reconstruct the file.

11   Q    And you testified earlier that an image or a file is

12   encrypted when it's uploaded?

13   A    Uh-huh.

14   Q    And then it's broken apart, correct?

15   A    Correct.

16   Q    And it's placed randomly on people's hard drives?

17   A    Correct.

18   Q    The person who is the original requester, is it fair to

19   say they know the file that they're looking for?

20   A    Correct.

21   Q    Whereas someone who is merely relaying a request, would

22   they know necessarily what the file is that this original

23   requester is looking for?

24   A    Not necessarily, especially since the requests are not

25   for a human-readable string.  It doesn't say this particular

1    video named "Alice and Bob at the Park."  Instead, it's a

2    numerical representation of that content, what's often

3    called a cryptograph or what is called a cryptographic hash.

4    It's a digital fingerprint of what's in there.  I don't know

5    if we need to get into how that works, but it's not a

6    human-readable string is my point.

7        (Off the record.)

8            THE WITNESS:  String.  I'm sorry.  That's a

9    computer science word for text.

10   Q    (BY MS. CASSIDY) And, Professor Levine, thank you for

11   going through that.  I know it was daunting.  But in your

12   studies and research of Freenet, have you found the software

13   program to be used for any nefarious reasons?

14   A    I have.

15   Q    What are some of those reasons?

16   A    So, in our peer-reviewed paper, we documented that when

17   we took a look at the network and what was being

18   requested -- because when a request comes in, if you have

19   a -- let me just say this simply.  So in our peer-reviewed

20   paper, we looked at the type of files that were being

21   requested by peers on Freenet, and at least 30 percent of

22   the time those requests were for files related to child

23   sexual exploitation, and we repeated that experiment four

24   times over four years and that was true each time.

25   Q    And have you assisted law enforcement in any capacity

1  with regard to Freenet?

2  A    I have.

3  Q    And are you actually performing contract work with the

4  FBI?

5  A    I do.

6  Q    In what ways have you assisted law enforcement?

7  A    So, in general, we have provided them tools for

8  network-based investigations of typically child sexual abuse

9  and for crimes related to child sexual abuse.  Specifically

10  for Freenet, we provided them software so that they could

11  perform forensically-sound investigations of, as I said,

12  crimes against children on Freenet.

13  Q    Thank you.  I want to talk a little bit about that

14  software program.  You previously testified that Freenet is

15  an open source software, correct?

16  A    I did.  It is.

17  Q    Can you explain the software program that you have

18  created?

19  A    Yes.  So, as you said, Freenet -- as I said, Freenet is

20  an open source software and so we were able to download the

21  source code for Freenet, and then we were able to make small

22  modifications to it so that the same software could be used

23  by law enforcement in an undercover capacity and, in

24  particular, modifications be made, allow them to record

25  information while they used it in this undercover capacity

1  so that they could make conclusions related to an

2  investigation.

3  Q    You said that the modification was that it records

4  information.  What type of information is being recorded?

5  A    So we record information that is already available to

6  users.  Freenet can also record this information for you,

7  but then it also records a lot of other information that

8  wouldn't be useful in an investigation, like extraneous

9  information.  I'm sorry, Your Honor.

10           THE COURT:  Go on.

11           THE WITNESS:  Okay.  So specifically what I'll

12  call the law enforcement version of Freenet that we wrote

13  records information related to how many requests came from a

14  neighboring peer of law enforcement, at what time that

15  request was made, what the actual request was for, like what

16  specific block was requested, and a few other details that

17  allow them to conduct an investigation.

18  Q    (BY MS. CASSIDY) And I think you said this, but this

19  information is available to all Freenet users?

20  A    Correct.

21  Q    The law enforcement version doesn't create some

22  proactive mechanism to it that allows law enforcement to go

23  into somebody's hard drive?

24  A    That's correct.  The law enforcement version doesn't

25  act any differently than anyone else running Freenet.  It

1    doesn't -- it doesn't hack into the neighbor's computer.

2    It doesn't send any messages that aren't already part of the

3    normal operation of Freenet.

4    Q    Is it fair to say that the law enforcement version is

5    like a passive receiver of requests like other peers?

6    A    Correct.

7    Q    Have you also assisted law enforcement by developing an

8    algorithm or technique with regard to Freenet?

9    A    I have.

10   Q    What is the goal or purpose of the algorithm?

11   A    So, as I mentioned earlier, one of the goals of

12   Freenet was to provide some level of privacy to the users

13   who are downloading or uploading content into it.  And so

14   the purpose of the algorithm is to allow law enforcement to

15   determine when they receive a request whether this request

16   is -- whether the request originated with their neighbor or

17   whether that neighbor is merely relaying this request for

18   someone else.  Because, recall, I said when you download

19   something in Freenet, you make a request of the neighbor and

20   you say to the neighbor, if you don't have what I'm looking

21   for, please get it from one of your neighbors.  So, on the

22   flip side of that, if you are receiving a request, Freenet

23   makes it difficult for any single request to determine if

24   it's originating with the neighbor who sent it or whether

25   there earlier.

1    Q    And have you reviewed Freenet's website?

2    A    I have.

3    Q    Does Freenet even contemplate that someone could figure

4    out who was their requester of a file versus who was a

5    relayer?

6    A    They do.

7              MS. CASSIDY:  Mr. Goodwin, can you pull up

8    Government Exhibit 2?  And, Mr. Goodwin, if you want to

9    scroll down so that the "Correlation attacks" section is

10   visible.  Thank you.

11   Q    (BY MS. CASSIDY) Professor Levine, do you recognize

12   this snapshot?

13   A    I do.  It's a portion of their help page on their

14   website.

15   Q    "Their" being Freenet?

16   A    "Their" being Freenet Project, correct.

17             MS. CASSIDY:  Your Honor, at this time the

18   government would move into evidence Government Exhibit 2.

19             THE COURT:  Any objection?

20             MR. SALOMON:  No objection, Your Honor.

21             THE COURT:  That's received into evidence.

22   Q    (BY MS. CASSIDY) Professor Levine, if you would just

23   read the first sentence after "Correlation attacks."

24   A    It says, "If you are connected to a node, and can

25   recognize the keys being requested (probably because it was

1   posted publicly), you can show statistically that the node

2   in question probably requested it, based on the proportion

3   of the keys requested from that node, the locations of

4   nearby nodes, the HTL," or Hops to Live, "on the requests

5   and so on."

6   Q    And there is actually something in here that I want to

7   ask you about before we get further into this, but this

8   states that "probably because it was posted publicly."  Is

9   the manifest key sometimes posted somewhere for others to

10   access it?

11   A    Yes, it is.

12   Q    So, for example, if I posted -- or if I uploaded a file

13   and received a manifest key, where could I post it so that

14   that manifest is made available to others?

15   A    Well, so, as you said, first of all, you can decide not

16   to, but, of course, you're inserting it so that someone else

17   can download it.  So you have a lot of choices.  You can

18   send it by text to a friend of yours.  You can email it to

19   someone.  You can publish it on any website that we all go

20   to on the regular internet, or there are forums on Freenet

21   itself that other Freenet users can see and only Freenet

22   users and you can post it on those forums.

23   Q    And turning back now to what you just read on the

24   Freenet page, essentially what is Freenet warning its users

25   of?

1    A    It's warning that the privacy that they aim to protect

2    is not perfect and that with the information that they state

3    it could be de-anonymized, I would say.

4    Q    And not to oversimplify your work, but is that

5    essentially what your algorithm or technique does?

6    A    Correct.

7    Q    You testified previously that you published papers

8    related to Freenet.  Did any of those papers relate to your

9    algorithm?

10   A    They did.

11   Q    And was that paper peer-reviewed?

12   A    There were two and both were peer-reviewed.

13        MS. CASSIDY:  Mr. Goodwin, if you would just pull

14   up Government Exhibit 3.

15   Q    (BY MS. CASSIDY) Professor Levine, do you recognize

16   this document?

17   A    I do.

18   Q    What is it?

19   A    This is the second of the two peer-reviewed papers that

20   was published in 2020.

21        MS. CASSIDY:  Your Honor, at this time the

22   government would move into evidence Government Exhibit 3.

23        MR. SALOMON:  No objection, Your Honor.

24        THE COURT:  Exhibit 3 is received into evidence.

25        MS. CASSIDY:  And, Your Honor, based upon the

1  motion to suppress and in speaking with defense counsel, it

2  doesn't appear the defendant is challenging the veracity of

3  the algorithm.  I just wanted to make it available to the

4  Court.

5           THE COURT:  Okay.

6           MS. CASSIDY:  So I don't intend to ask any

7  questions about the specifics at this time.

8           THE COURT:  All right.

9  Q    (BY MS. CASSIDY) So, Professor Levine, in short, does

10 the algorithm take information that is known to Freenet

11 users to determine who is the original requester versus who

12 is merely relaying a request for a file?

13 A    Correct.

14 Q    And has this algorithm been shared with law enforcement

15 to aid in your investigation?

16 A    It has.

17 Q    And, to be clear, you did not work specifically on this

18 case that we're here today?

19 A    I did not.

20           MS. CASSIDY:  Thank you, Your Honor.  I'll tender.

21           THE COURT:  Any questions, Mr. Salomon?

22           MR. SALOMON:  Just a handful.

23                      CROSS-EXAMINATION

24 BY MR. SALOMON:

25 Q    Professor, if I may back up.  I assume you're aware of

1    the cases where, let's say, Google or Meta or someone found

2    some CSAM materials and then reported it to law enforcement?

3    A    I am aware that that happens.

4    Q    Okay.  Now, with the Freenet, that is not what

5    occurred.  There is no, like, Google or someone else out

6    there that's monitoring and then reporting to law

7    enforcement?

8    A    Correct.

9    Q    In this instance, from the paperwork that I've seen and

10    been supplied, apparently you -- and, as it warrants, you

11    are publicly publishing what you're seeking --

12    A    Correct.

13    Q    -- right?

14    A    As downloaded.

15    Q    That can be downloaded.  And that is -- is that your

16    understanding of what occurred here, by way of this law

17    enforcement, I guess, algorithm that was supplied to them?

18    In other words, to let them modify it and then access the

19    public aspect of Freenet?

20    A    Can you clarify what you are specifically talking

21    about?

22    Q    Well, I'm saying you supplied information to law

23    enforcement so that they could access Freenet in the public

24    aspects of it; is that correct?

25    A    I supply to them software that allow them to conduct

1  investigations on --

2  Q    Okay.

3  A    -- the system that was already public.  I think that's

4  what you're asking.

5  Q    And that was my question.  So it's accessing what's

6  already public?

7  A    Correct.

8  Q    This isn't some sort of dark aspect or some nefarious

9  entry into the -- into Freenet or anything along those

10  lines?

11  A    No.

12  Q    This is something that if I entered into Freenet, I

13  could pull up the same public information?

14  A    Correct.

15  Q    Thank you.

16        MR. SALOMON:  That's all I have.

17        THE COURT:  All right.  Thank you.

18    Any further questions?

19        MS. CASSIDY:  No.  Your Honor.

20    Thank you, Professor.

21        THE COURT:  Okay.  Thank you, Professor.  I

22  appreciate it.  And I am interested, so I'm going to read

23  your article even if I don't read it for this motion.

24        THE WITNESS:  All right.  Thank you, Your Honor.

25        MS. CASSIDY:  Your Honor, and I don't know if

1   necessarily Mr. Levine needs to be released from his

2   subpoena since he is the expert, but if he would be

3   permitted to stay in the courtroom.

4                THE COURT:  Any objection?

5                MR. SALOMON:  No objection.

6                THE COURT:  Then it certainly is.

7                MS. CASSIDY:  All right.  Your Honor, Agent Capers

8   is going to go get our next witness which is Special Agent

9   William Scullin.

10               (Witness sworn.)

11                    SPECIAL AGENT WILLIAM SCULLIN,

12  having been first duly sworn to testify the truth, the whole

13  truth, and nothing but the truth, testified as follows:

14                        DIRECT EXAMINATION

15  BY MS. CASSIDY:

16  Q    Good morning.

17  A    Good morning.

18  Q    Would you state and spell your name for the record?

19  A    Yes.  William Scullin.  That's S-C-U-L-L-I-N.

20  Q    How are you employed?

21  A    I'm a special agent with the FBI.

22  Q    How long have you been with the FBI?

23  A    Five years.

24  Q    Prior to the FBI, were you employed in any other law

25  enforcement capacity?

1    A    Yes.  I was a special agent with the Air Force Office

2    of Special Investigations for nine years.

3    Q    And as it specifically relates to your current position

4    with the FBI, are you assigned to any particular unit?

5    A    Yes.  Currently, I am assigned to the Child

6    Exploitation Operation Unit in Maryland.

7    Q    How long have you been with that unit?

8    A    Approximately seven months.

9    Q    What are some of your duties and responsibilities

10   there?

11   A    Broadly, I investigate suspected or alleged violations

12   of U.S. law.  The squad I'm currently assigned to focuses on

13   undercover operations and the exploitation of -- the sexual

14   exploitation of children in travel and tourism.

15   Q    And I assume those investigations involve child sexual

16   abuse material?

17   A    Yes, they do.

18   Q    Is that also known by the acronym CSAM?

19   A    Yes, ma'am.

20   Q    Prior to joining the unit, what division or section of

21   the FBI were you assigned?

22   A    I was assigned to the New Orleans division,

23   specifically the Shreveport satellite office.

24   Q    What were some of your duties and responsibilities?

25   A    Again, broadly, I investigated suspected or alleged

1  offenses of U.S. law, specifically focusing on violent

2  crimes against children.

3  Q    In addition to your on-the-job experience, did you

4  receive training with regard to your investigations?

5  A    I did, yes.

6  Q    Did part of that training include Freenet?

7  A    Yes.

8  Q    I'd like to direct your attention to August of 2021.

9  Did you begin an investigation involving CSAM being

10 downloaded in the Monroe area?

11 A    Yes, ma'am.

12 Q    Were you the case agent at that time?

13 A    I was.

14 Q    How did that investigation first come to your

15 attention?

16 A    I received a lead through a law enforcement database

17 that I was given access to after I completed specific

18 training requirements that essentially collects information

19 on suspected instances of online sexual child exploitation

20 offenses.

21 Q    And why was that lead sent to you in particular?

22 A    So at the time I was the only FBI agent that was

23 Freenet certified, which had to do with this investigation,

24 investigatively responsible for the northern half of

25 Louisiana.

1    Q     The lead that you received, did it involve Freenet?

2    A     It did, yes, ma'am.

3    Q     And according to this lead, when were the suspected

4    CSAM images being downloaded?

5    A     It was May and July of 2021.

6    Q     Did the lead give you an IP address associated with

7    that?

8    A     It did, yes, ma'am.

9    Q     And the Court has already heard testimony from

10   Professor Levine, but if you can just tell the Court, what

11   is your understanding of Freenet based upon your training?

12   A     Certainly.  So, in its simplest form, Freenet is an

13   internet-based, peer-to-peer network or platform.  It is

14   publicly available and free to download.  So anyone with

15   access to the internet and with access to a computer is able

16   to download the software.

17        The network itself is primarily used for users to share

18   files, but they can also do things such as chat on message

19   boards and visit sites within the network.  So, as I said,

20   users can share files on this network, which include

21   uploading and downloading files to and from the network.

22        So when a user installs Freenet on their machine, they

23   run the software and Freenet connects to other machines

24   running Freenet which are obviously also connected to the

25   internet.  Those connections are called peers.

1    So when a user decides to upload a file, Freenet, the
2    software, assigns a key to that file and the key is just a
3    long alphanumeric code that is really a file like in a file,
4    in a sense.
5    So when a user wants to download a file, they need that
6    specific key.  So if a user is unable to search for a file
7    name or file type, they need that specific key for a
8    specific file they are interested in.
9    Q    And let me stop you right there --
10   A    Yes.
11   Q    -- just because the Court has heard testimony on this.
12   But it's your understanding then that that key is sent out
13   to Freenet and it's requested of peers, and if those peers
14   don't have it, it's friend requested?
15   A    That's correct.  Yes, ma'am.
16   Q    Okay.  And I apologize for cutting you off.
17   A    No, no problem.
18   Q    I didn't want to replow old ground.
19   And did your training on Freenet specifically help in
20   determining how to identify who is requesting CSAM versus
21   who is merely relaying a request to CSAM?
22   A    Yes, ma'am.
23   Q    You testified about this lead, but did you rely solely
24   on that lead in your investigation?
25   A    No, ma'am.

1    Q      What did you do?

2    A      So I collected the lead information from the law

3    enforcement database and then, based on my training, we

4    learned a procedure to validate that that information was,

5    in fact, suspected to be a requester or originator of CSAM

6    files.

7    Q      So let's start with, how were you able to determine

8    first that this particular IP address in Monroe was, in

9    fact, requesting CSAM?

10   A      How did I first determine?

11   Q      Yes.  How did you determine that the file itself was,

12   in fact, CSAM?

13   A      Okay.  I'm sorry.  Okay.  I understand.  So what I did,

14   as part of that lead, I received the specific key to the

15   specific file that the IP address was requesting.  So those

16   files were suspected to be CSAM at the time, but, of course,

17   I validated and confirmed that.  So what I did is I inputted

18   the key into Freenet, downloaded the specific file related

19   to that key, viewed the file and confirmed that those files

20   met the statutory definition of child pornography.

21   Q      And then, you spoke to this a moment ago, but how did

22   you then determine that particular IP address was the

23   original requester of the download versus an individual

24   relaying a request for the download?

25   A      Yes.  So during my training we were provided a

1  procedure to follow to validate and confirm that that IP

2  address was, in fact, a requester.  Specifically that

3  procedure involved a spreadsheet with a mathematical

4  equation or algorithm embedded into that spreadsheet.  So I

5  inputted various amounts of data that I obtained from the

6  lead into the spreadsheet to ensure that it passed the

7  algorithm.

8  Q    And this algorithm, who was it created by?

9  A    In part or in whole by Professor Levine.

10 Q    What information would you put into this algorithm to

11 run the test?

12 A    Lots of data goes into the algorithm, into the

13 spreadsheet, and then into the algorithm.  But important

14 pieces are IP address, date and time, the number of peers,

15 and the number of requested blocks from an IP address.

16 Q    Is this information available to all users of Freenet?

17 A    Yes.  If the correct settings are set.

18 Q    Is there a certain amount of times that you run this

19 algorithm?

20 A    Yes.  In this specific investigation, I ran it three

21 times which related to three specific incidents where the

22 IP address requested specific CSAM files.

23 Q    And by running the algorithm that number of times did

24 you reach a result?

25 A    Yes, I did.

1  Q    And what was your result?

2  A    I validated that the IP address in question was an

3  originator or requester of those CSAM files.

4  Q    I might ask you a difficult question.  Do you remember

5  the IP address off the top of your head?

6  A    I do not.  I believe it began with "98 dot," but I'm

7  not sure of the rest.

8  Q    Okay.  Did part of your investigation include

9  identifying the service provider for the IP address?

10  A    Yes, ma'am.

11  Q    Which company was the service provider?

12  A    Comcast.

13  Q    Once you identified Comcast as the search provider, did

14  you issue an administrative subpoena?

15  A    Yes, ma'am.

16  Q    And specifically what were you looking for?

17  A    Basic subscriber information which included customer

18  name and address.

19        MS. CASSIDY:  Mr. Goodwin, if you could pull up

20  Government Exhibit 4.  And if you would scroll to page 2.

21  Q    (BY MS. CASSIDY) Agent Scullin, do you recognize this?

22  A    I do, yes.

23  Q    What is this?

24  A    This is the administrative subpoena I served to

25  Comcast.

1          MS. CASSIDY:  Mr. Goodwin, if you would go to

2    page 3 and page 4.  And now page 5.  I apologize.

3          Perfect.  Thank you.

4    Q    (BY MS. CASSIDY) Agent Scullin, is this the IP address

5    associated with the CSAM material?

6    A    Yes, ma'am.

7    Q    You list a series of dates and times on the subpoena.

8    What are those signifying?

9    A    Those are the specific dates and times that I

10   originally received the lead of the IP address in question

11   requesting blocks related to suspected CSAM files.

12   Q    So, in layman's terms, these are the dates and times

13   that the IP address was downloading child pornography?

14   A    Correct.  In the general sense, yes.

15   Q    Thank you.

16          MS. CASSIDY:  Your Honor, at this time the

17   government would move into evidence Government Exhibit 4.

18          MR. SALOMON:  No objection.

19          THE COURT:  Exhibit 4 is received into evidence

20   without objection.

21          MS. CASSIDY:  Mr. Goodwin, I'm sorry, would you go

22   back to page 1.

23   Q    (BY MS. CASSIDY) Agent Scullin, based upon the date,

24   when was the fax sent to Comcast?

25   A    September 2nd, 2021.

1    Q    And your investigation you said started in August of

2    2021?

3    A    Yes, ma'am.

4    Q    So within that time you had identified the CSAM

5    material and run your algorithm?

6    A    Yes, ma'am.

7    Q    Based upon the results provided by Comcast, to what

8    address and individual was the IP address subscribed?

9    A    Mr. Robert Brown at 3012 Deborah Drive in Monroe,

10   Louisiana.

11   Q    Once you got the information of this location as the

12   individual, did you immediately go do a search warrant?

13   A    No, ma'am.

14   Q    Why not?

15   A    So I generally will conduct further investigative

16   activity to ensure that the residents still live at that

17   address and also conduct basic law enforcement checks to

18   include criminal histories, social media, and open source

19   information, to get an idea of who else may live at the

20   residence.

21   Q    What did you learn about Robert Brown at 3012

22   Deborah Drive?

23   A    Robert Brown, Junior, or Senior?

24   Q    Senior.  I apologize.

25   A    No problem.  I learned that he did, in fact -- it

1    appeared that he still lived at the residence.

2    Q    Did you learn about any other individuals living at the

3    residence?

4    A    Yes.  Ms. Katherine Brown and Mr. Robert Scott Brown,

5    Jr.

6    Q    And you testified that you did other investigative

7    measures like criminal history checks.  Did you conduct

8    surveillance of the residence?

9    A    I did.  I conducted physical surveillance.

10   Q    Did you also do a social media search for these

11   individuals?

12   A    Yes, ma'am.

13   Q    Did you check their employment status?

14   A    Yes, ma'am.

15   Q    And where did you learn that Robert Scott Brown, Jr.

16   was employed?

17   A    He was employed by the Ouachita Parish School Board as

18   an IT professional.

19   Q    While you were investigating -- I'll just say the

20   Brown family -- in this particular residence, did you

21   receive any more leads from the law enforcement database

22   concerning this IP address?

23   A    I did.  I continuously received leads as the

24   investigation progressed regarding the IP address in

25   question continuously requesting blocks of suspected CSAM.

1    Q    When was the last time that this IP address was
2    associated with CSAM in a law enforcement lead?
3    A    It was December 2nd of 2021.
4    Q    As you're conducting your investigation, are you
5    speaking with other agents and law enforcement officials
6    about what you're uncovering?
7    A    Yes, ma'am.
8    Q    Who were some of them individuals you spoke with over
9    that period of time?
10   A    One individual was Investigator James Humphrey.
11   Q    And who was he in relation to this investigation?
12   A    So he was a task force officer assigned full time to
13   the FBI office in Monroe, but his parent agency was with the
14   Ouachita Parish Sheriff's Office.
15   Q    And what were some things that you would have discussed
16   with Investigator Humphrey?
17   A    In this case, it was the facts and circumstances of the
18   investigation to date, which included the background of what
19   Freenet is and how it works in the general sense and how my
20   investigation led to the house on Deborah Drive.
21   Q    On January 28 of 2022, did you obtain a federal search
22   warrant for the Deborah Drive residence?
23   A    I'm sorry.  I missed that date, ma'am.
24   Q    January 28th, 2022?
25   A    Yes, ma'am.

1    MS. CASSIDY:  And, Mr. Goodwin, if you would just
2  pull up Government Exhibit 5.
3  Q    (BY MS. CASSIDY) Agent Scullin, does this appear to be
4  the search warrant that you obtained?
5  A    Yes, ma'am.
6    MS. CASSIDY:  Your Honor, the government would
7  move into evidence at this time Government Exhibit 5.
8    THE COURT:  Any objection, Mr. Salomon?
9    MR. SALOMON:  I'm sorry.  I couldn't hear you.
10    THE COURT:  No objection, I assume?
11    MR. SALOMON:  No.
12    THE COURT:  Okay.
13    MR. SALOMON:  I'm sorry.
14    THE COURT:  That exhibit is also received into
15  evidence.
16    MS. CASSIDY:  Thank you, Your Honor.
17  Q    (BY MS. CASSIDY) What date did you execute the search
18  warrant?
19  A    February 1st of -- I'm getting my years mixed up.  It
20  would have been 2022.
21  Q    Did you have other law enforcement officials aid you in
22  the execution of the search warrant?
23  A    I did, yes, ma'am.
24  Q    Was Investigator Humphrey one of those individuals?
25  A    He was, yes.

1    Q    At the time you executed the warrant at the Deborah

2    Drive residence was anyone present?

3    A    Yes.

4    Q    Who was that?

5    A    It was Mr. Robert Scott Brown, Sr., and Mrs. Katherine

6    Brown.

7    Q    Did you conduct interviews of them?

8    A    I did, yes, ma'am.

9    Q    And I want to get to specifics of their interviews in

10   just a moment, but did law enforcement officials conduct an

11   on-site -- let me back up and lay a foundation.  During the

12   search, did law enforcement find electronic devices inside

13   that home?

14   A    Yes, we did, ma'am.

15   Q    Did agents do an on-site forensic search of those

16   devices?

17   A    We did.  We did what's called basically a forensic

18   preview, in a sense.  It's not a full forensic examination,

19   but gives us an idea of what type of files are on the

20   specific devices.

21   Q    Based upon that preview, was there any CSAM on those

22   devices?

23   A    There was not.

24   Q    And when you interviewed Robert Brown, Sr., and

25   Katherine Brown, what did they tell you that was relevant to

1    your investigation?

2    A    I learned that their son, Mr. Robert Scott Brown, Jr.,

3    had lived at the residence for several years, but had

4    recently moved out in the rough time frame of the end of

5    December.

6    Q    Was the timing of his move from the residence

7    significant to your investigation?

8    A    Yes.

9    Q    In what way?

10   A    So after December 2nd of 2021 I received no further

11   leads identifying the IP address at 3012 Deborah Drive of

12   attempting to download suspected CSAM files.

13   Q    Was this information, specifically the timing of the

14   last CSAM, made known to the other officials who were

15   assisting in the search warrant?

16   A    Yes, ma'am.

17   Q    Particularly Investigator Humphrey?

18   A    Yes, ma'am.

19   Q    Did you have an opportunity to interview Robert Scott

20   Brown, Jr.?

21   A    I did, yes, ma'am.

22   Q    Do you see him in the courtroom today?

23   A    Yes, ma'am.

24   Q    Can you identify him for the record?

25   A    Yes.  He is sitting at the defense counsel's table

1    behind his attorney.

2            MS. CASSIDY:  Your Honor, would the record reflect

3    that the witness has identified the defendant in open court?

4            THE COURT:  The record will reflect that.

5            MS. CASSIDY:  Thank you.

6    Q    (BY MS. CASSIDY) Who else was present during your

7    interview of the defendant?

8    A    There was another FBI agent, Special Agent Raquel

9    Mobley.  So really the interview was kind of broken up into

10   two phases.  The first phase was myself and Special Agent

11   Raquel Mobley, and then the second phase was myself,

12   Agent Mobley, and then Investigator Humphrey.

13   Q    Was the interview recorded?

14   A    It was, yes.

15   Q    During the interview process, I would say at the

16   beginning, did you advise the defendant of his Miranda

17   rights?

18   A    I did, yes, ma'am.

19   Q    Did the defendant tell you anything significant to your

20   investigation?

21   A    Yes.  He admitted to viewing pornography on a near

22   daily basis specifically in the genres of old, young, and

23   incest.  He told me that he had no idea what Freenet was and

24   he was not familiar with it, but he also confirmed that he

25   moved out the end of December of 2021.

1  Q    Did law enforcement that same day obtain a search

2  warrant for the defendant's new residence?

3  A    Yes.  We obtained a state search warrant.

4  Q    Where was Mr. Robert Brown, Senior -- sorry -- Junior

5  living at that time?

6  A    He was living approximately a mile or so down the road

7  at an apartment complex at 3100 Deborah Drive, apartment 61.

8  Q    And which law enforcement official obtained the state

9  search warrant?

10 A    Investigator James Humphrey.

11 Q    You previously testified that you spoke with

12 Investigator Humphrey about this investigation?

13 A    Yes, ma'am.

14 Q    And he was present during the interview of the

15 defendant?

16 A    Yes, ma'am.

17 Q    Was the search warrant executed that same day?

18 A    It was.  As soon as we concluded the execution of the

19 federal warrant at 3012 Deborah Drive.

20 Q    During the search of the defendant's apartment did

21 officials find anything of significance?

22 A    We did.  In Mr. Brown, Jr.'s bedroom, he had a computer

23 that was on and running Freenet.

24 Q    Did you also locate some hard drives?

25 A    I did, yes, ma'am.

1    Q    Was a search of those hard drives later conducted?

2    A    Yes.  Off-site.

3    Q    Was anything of significance located?

4    A    Yes.  We found hundreds, if not thousands, of items of

5    suspected child sexual abuse material, which included both

6    videos and images.

7    Q    Were they in any particular file on the hard drive?

8    A    Yes.  One particular file of interest to me was the

9    same file that Mr. Brown had requested back my original

10   lead, so that indicated that suspected file was successfully

11   downloaded onto Mr. Brown's machine.

12   Q    And were any of these files saved in a folder of

13   notable -- the name of which was notable to you?

14   A    Yes.  They were saved in the default location which was

15   the Freenet downloads folder.

16   Q    And my last question to you, Agent Scullin:  Prior to

17   the search warrant of the Deborah Drive residence, did you

18   ever conduct a search of the defendant's hard drive?

19   A    No, ma'am.

20   Q    The information you obtained, fair to say it was just

21   relayed to you as a user of Freenet?

22   A    Yes, ma'am.

23   Q    Thank you.

24           MS. CASSIDY:  I'll tender, Your Honor.

25           THE COURT:  Mr. Salomon.

1      MR. SALOMON:  Thank you.

2                  CROSS-EXAMINATION

3   BY MR. SALOMON:

4   Q    Agent Scullin, I'm Val Salomon.  I represent Mr. Brown.

5   I have a few questions.

6        First of all, you mentioned some surveillance.  When

7   did that occur?

8   A    The physical surveillance was -- I don't remember the

9   specific date, but it was -- it was around the time or just

10  prior to the execution of the federal warrant.

11  Q    Yet you weren't aware that Mr. Brown wasn't living at

12  that address on Deborah Drive?

13  A    From the physical surveillance, we were unable to

14  determine that.

15  Q    Now, you mentioned that the last CSAM was when?

16  A    December 2nd, 2021.

17  Q    And that was from an IP address located at what?

18  3012 Deborah Drive?

19  A    That's correct, yes, sir.

20  Q    Now, the search warrant that you mentioned where you

21  found the younger Mr. Brown, the computers and these

22  materials, was that at 3012 Deborah Drive?

23  A    No.  That was on the fall on second search warrant

24  executed on Mr. Brown, Jr.'s residence at 3100 Deborah

25  Drive.

1  Q    Apartment 61?

2  A    Yes, sir.

3  Q    Okay.  And I notice that the materials that I received

4  from the government that you had a rather -- rather lengthy

5  search warrant that you compiled and submitted to the

6  federal magistrate for review and signature that dealt with

7  the 3012 Deborah Drive.

8  A    Correct, yes, sir.

9  Q    Do you remember about how many pages that item was?

10  A    My actual affidavit?

11  Q    Yeah.

12  A    I don't remember how many.

13  Q    It was lengthy though?

14  A    It was lengthy, yes, sir.

15  Q    And detailed?

16  A    Yes.

17  Q    Okay.  Did you -- did you compile a similar warrant for

18  the apartment, the 3100 Deborah Drive?

19  A    I did not, no.

20  Q    Did you compile the warrant that was ultimately

21  utilized to search that particular apartment?

22  A    When you say "compiled," do you mean --

23  Q    Did you --

24  A    -- drafted?

25  Q    -- do the affidavit?

1    A    No.  I was not the affiant.

2    Q    It's my understanding from your testimony then that

3    apparently Deputy Humphrey is the person that compiled that

4    affidavit for the second warrant?

5    A    Yes, sir.

6    Q    And the first warrant that you compiled and that was

7    executed on 3012 Deborah Drive turned up zero; is that

8    correct?

9    A    Correct.  We found no evidence of child sexual abuse

10   material at that residence.

11   Q    Thank you.

12            MR. SALOMON:  I think that's all I have.

13            MS. CASSIDY:  Brief redirect, Your Honor?

14            THE COURT:  Okay.

15            MS. CASSIDY:  Thank you.

16                    REDIRECT EXAMINATION

17   BY MS. CASSIDY:

18   Q    Agent Scullin, I have in front of me Government

19   Exhibit 5 which is your affidavit and your search warrant.

20            MS. CASSIDY:  May I approach, Your Honor?

21            THE COURT:  Yes.

22            THE WITNESS:  Thank you, ma'am.

23            MS. CASSIDY:  Thank you.

24   Q    (BY MS. CASSIDY) Agent Scullin, would you just look

25   through that momentarily and just familiarize yourself with

1    the information that you put in the affidavit?

2    A    Absolutely.

3    Q    As you go through that, is it fair to say that a lot of

4    your affidavit is explaining how law enforcement came to

5    identify this IP address as a Freenet user?

6    A    Yes, ma'am.

7              MS. CASSIDY:  Nothing further, Your Honor.

8    Thank you.

9              THE COURT:  Okay.  Thank you.

10             (Off the record.)

11             THE COURT:  In case you want to recall him, you're

12   going to ask him to step out?

13             MS. CASSIDY:  Yes.

14             THE COURT:  I wanted to make sure we had that on

15   the record.

16             MS. CASSIDY:  Yes.

17             THE COURT:  I know you guys talked about it,

18   but --

19             MS. CASSIDY:  Yes.  The defense counsel has made

20   me think I might.

21             THE COURT:  Just in case.

22             MS. CASSIDY:  Thank you.

23       And, lastly, Your Honor, the government would call

24   investigator James Humphrey.

25             THE COURT:  Okay.

```
 1              (Witness sworn.)
 2                   SERGEANT JAMES HUMPHREY,
 3   having been first duly sworn to testify the truth, the whole
 4   truth, and nothing but the truth, testified as follows:
 5                   DIRECT EXAMINATION
 6   BY MS. CASSIDY:
 7   Q    Good morning.
 8   A    Good morning.
 9   Q    Would you state and spell your name for the record?
10   A    James Humphrey.  It's J-A-M-E-S.  Humphrey,
11   H-U-M-P-H-R-E-Y.
12   Q    How are you employed as evidenced by your uniform?
13   A    The Ouachita Parish Sheriff's Office.
14   Q    How long have you been with the sheriff's office?
15   A    Twenty-two years.
16   Q    Are you assigned to any particular division currently?
17   A    I recently took a promotion to a sergeant in the patrol
18   division.
19   Q    Prior to patrol, were you assigned to another division?
20   A    Yes.  I was in investigations division.
21   Q    Were you also a task force officer for a federal
22   agency?
23   A    Yes, ma'am.  For almost nine years.
24   Q    What agency was that?
25   A    The FBI.  The Federal Bureau of Investigation.
```

1    Q    Thank you.  As a task force officer as well as working
2    in investigations, what were some of your duties and
3    responsibilities?
4    A    During that time, it was investigating all child
5    sexual exploitation cases, online exploitation cases,
6    child pornography investigations.
7    Q    In addition to your nine years of on-the-job
8    experience, did you attend any courses or training with
9    regard to the investigation of internet crimes against
10   children?
11   A    Yes, ma'am.
12   Q    Giving a ballpark number, how many classes do you think
13   you attended?
14   A    Oh, dozens.  I couldn't tell you exact, because I was
15   also a member of the Louisiana Attorney General's Task
16   Force when they provided training as well.  So I was getting
17   training from the AG's Office and from the FBI.
18   Q    I'd like to direct your attention to February 1st of
19   2022.  Were you working with the task force at that time?
20   A    Yes, ma'am.
21   Q    Specifically the federal task force?
22   A    Yes, ma'am.  I'm sorry.
23   Q    Did you assist in the execution of a federal search
24   warrant at 3012 Deborah Drive in Monroe?
25   A    I did.

1    Q    What agency obtained the search warrant?

2    A    The Federal Bureau of Investigation.

3    Q    Who was the case agent?

4    A    Bill Scullin.

5    Q    Did you speak with Agent Scullin about the

6    investigation as it was occurring?

7    A    Yes, ma'am, I did.

8    Q    Based upon those conversations, what did you understand

9    this investigation was about?

10    A    Downloading CSAM, child sexual abuse material, via the

11    internet.

12    Q    And do you know specifically what program was used at

13    the time to download these images?

14    A    Yes, ma'am.  It was Freenet.

15    Q    Who was believed at that time to live at 3012

16    Deborah Drive?

17    A    Robert Brown, Sr.; his wife, Katherine; and their son,

18    Robert Brown, Jr.

19    Q    What was your role in the execution of the search

20    warrant?

21    A    So when the agents went to the home to execute the

22    search warrant, I was tasked with finding where Robert

23    Brown, Jr., was located.

24    Q    Did you find him?

25    A    I did.

1   Q    Where was he?

2   A    He was employed by the school board in the IT

3   department, and he was filling a ticket at a local middle

4   school.

5   Q    Did you go to the middle school?

6   A    I did.

7   Q    And you found him?

8   A    Yes, ma'am.

9   Q    At that point did he go with you back to the residence?

10  A    He did.

11  Q    Did you place him under arrest?

12  A    No, ma'am.

13  Q    Did you force him to go back to the residence?

14  A    No, ma'am.

15  Q    And I didn't ask you this earlier, but with regard to

16  your conversations with Agent Scullin, what was your

17  understanding of when these CSAM images had been downloaded?

18  A    In the fall of 2022.

19            THE COURT:  2022 or 2021?

20            THE WITNESS:  I'm sorry.  2021.

21  Q    (BY MS. CASSIDY) Once you arrived at the residence,

22  did you learn if agents had conducted any type of on-site

23  forensic review of the digital devices at the Deborah Drive

24  residence?

25  A    Yes, ma'am.

1  Q    Was any CSAM material located on the devices?

2  A    No, there was not.

3  Q    Are you aware if Robert and Katherine Brown were

4  present at the home?

5  A    Yes, ma'am.

6  Q    Is it your understanding that they were interviewed?

7  A    I think they were interviewed.  I was not there for

8  that portion of it.

9  Q    Did you learn what Robert and Katherine Brown told

10  agents during their interviews?

11  A    That their son had moved out recently.  He was living

12  in an apartment nearby.

13  Q    Did you participate in an interview of the defendant?

14  A    Portions of it, yes, ma'am.

15  Q    And I say the "defendant," do you recognize Robert

16  Scott Brown, Junior --

17  A    I do.

18  Q    -- in the courtroom today?

19  A    I do.

20  Q    What information was learned from the defendant during

21  that interview?

22  A    He denied that he downloaded CSAM or child sexual abuse

23  material and admitted to downloading -- I mean viewing other

24  types of pornography on a daily basis and that he had

25  recently moved out.

1    Q    Was there anything significant about the timing of the

2    defendant's move from the residence and the CSAM material?

3    A    Yes, ma'am.  Beyond the date -- when he moved out,

4    there were no more images viewed, being downloaded, from

5    that residence on Deborah Drive.

6    Q    And it was your understanding that he moved out

7    approximately when?

8    A    In December.

9    Q    After interviewing the defendant, what did you do next?

10   A    We secured a search warrant for his apartment and that

11   was executed as well.

12   Q    The search warrant that was obtained, were you the

13   affiant?

14   A    I was.

15   Q    Where were you when you wrote out that search warrant?

16   A    I was sitting in my vehicle in my truck on the laptop

17   that afternoon.

18   Q    Was there any type of urgency to obtain this warrant?

19   A    Yes, ma'am.

20   Q    Why?

21   A    For fear of destruction of the evidence.  That's the

22   main reason.

23   Q    You recently testified the defendant was not under

24   arrest?

25   A    Correct.

1  Q    Investigator Humphrey, do you recognize -- I'm sorry,

2  now Sergeant Humphrey -- do you recognize this document?

3  A    Yes, ma'am.

4  Q    What is it?

5  A    It's my oath in support of search warrant.

6          MS. CASSIDY:  Your Honor, at this time the

7  government would move into evidence Government Exhibit 6.

8          MR. SALOMON:  No objection, Your Honor.

9          THE COURT:  Exhibit 6 is received into evidence.

10         MS. CASSIDY:  Mr. Goodwin, if you would scroll

11 down so that the probable cause section is available.

12         Thank you.  Just right here.

13 Q    (BY MS. CASSIDY) Agent Humphrey, I want to specifically

14 note the section that I've just bracketed in red.  Would you

15 just read that into the record, please?

16 A    "The investigation and probable cause revolved around

17 person(s) at the residence who were viewing images related

18 to CSAM (child sexual abuse material) over the course of the

19 last few months of 2021."

20 Q    And would you expound upon that, based upon your

21 earlier testimony?  When we're talking about the last few

22 months of 2021, what was your understanding of when these

23 CSAMs were viewed?

24         MR. SALOMON:  Judge, I object.  I believe that we

25 should be within the four corners of the affidavit.

1    THE COURT:  Let me get you to do this, first of

2    all.

3    MS. CASSIDY:  Oh, sorry.

4    THE COURT:  Step up --

5    MR. SALOMON:  I'm sorry, Judge.

6    THE COURT:  -- the microphone.

7    MR. SALOMON:  My objection is that we should be

8    bound by the four corners of the affidavit.  Not extraneous

9    material that he may have learned before, after, or the

10   weeks past.

11   MS. CASSIDY:  Your Honor, I believe he has

12   testified to information that he learned this before

13   otherwise he couldn't have made it in the affidavit, but

14   also with the good faith exception, we look outside the

15   affidavit.

16   THE COURT:  I understand the legal argument,

17   Mr. Salomon, and I certainly will apply the law, but I do

18   want to hear the information as it relates to the good faith

19   exception, so the objection --

20   MR. SALOMON:  Note my objection.

21   THE COURT:  I am going to note your objection for

22   the record.

23   MS. CASSIDY:  Thank you, Your Honor.

24   THE COURT:  You may proceed.

25   Q    (BY MS. CASSIDY) And, Sergeant Humphrey, I apologize,

1    if you would just speak a little bit to the course of the

2    last few months of 2021.

3    A    So in -- I want to say it was in November, I was aware

4    that there was a target in the Monroe area.  I did not have

5    a lot of involvement in any of the investigation of that

6    target, but that, hey, there is going to be a search

7    warrant, you know.  We got an investigation open.  It's in

8    Monroe.  And we're going to be -- we're going to be working

9    it.  It's assigned to Agent Scullin, who was in the

10   Shreveport office, and to kind of be aware, it's coming.

11   And, like I said, that was in October, November.

12   Q    And as it relates to October, November, did you and

13   Agent Scullin specifically discuss when these images were

14   being downloaded?

15   A    Not the specific dates.  Just the times.

16   Q    And, I'm sorry, when we're talking about -- I don't

17   mean to pin you to a date, but just general parts of the

18   year.

19   A    Yes.

20   Q    And what was that?

21   A    The fall of 2021.

22   Q    And then the last part that I bracketed in your

23   affidavit, it says no evidence that criminal activity was

24   found at 3012 Deborah Drive where just the mother and father

25   reside and evidence also shows that there was no additional

1    CSAM activity beyond the date Robert Junior moved from the
2    residence.  How did you know that there had been no
3    additional CSAM recovered or downloaded?
4    A    Agent Scullin checked.
5    Q    Thank you.
6              MS. CASSIDY:  I'll tender, Your Honor.
7              THE COURT:  Mr. Salomon.
8              MR. SALOMON:  I'm sorry.  Is the -- without
9    scrolling, is the warrant itself, the search warrant itself
10   in here --
11             MS. CASSIDY:  Yes.
12             MR. SALOMON:  -- or just the other one?
13             MS. CASSIDY:  It's here, but if you want the
14   (inaudible).
15             MR. SALOMON:  No, no.  I got a copy of it.  I'm
16   just making sure, so --
17                      CROSS-EXAMINATION
18   BY MR. SALOMON:
19   Q    Sergeant Humphrey, if I can back up.  It's my
20   understanding you were not there for the interview with
21   Robert Senior and his wife Katherine?
22   A    Correct.
23   Q    You mentioned some information that you had and a
24   number of -- you know, much information that you perhaps had
25   learned as part of the investigation from the FBI.

1    A    Yes, sir.

2    Q    But in looking at the oath, it's not included in the

3    oath, is it?

4    A    So it's included in the oath about we were there to

5    execute a search warrant that had been obtained by the FBI

6    and it was registered to persons at that residence --

7    Q    But any of the --

8         (Simultaneous crosstalk.)

9    A    -- CSAM.

10    Q    But any of the information regarding with the

11    investigation, in the course of the investigation, it's not

12    within the four corners of your affidavit, is it?

13    A    Yes, sir, it is.

14    Q    Oh, it is.  Okay.  Well, I have another question,

15    though, while I'm thinking about it.

16         MR. SALOMON:  Can we pull up the actual search

17    warrant for the property?  That's fine.  You can stop right

18    there.

19    Q    (BY MR. SALOMON) Can you see that?  Where it says

20    "you are hereby ordered"?

21    A    Yes.

22    Q    Why did you want to search 304 Medorah Drive?

23    A    That appears to be an error on my part.

24    Q    Okay.  Was this some sort of standard language that you

25    appropriated from some other warrant and stuck it in there

1   and that's where that came from?

2   A    No.  Some of the information from what we were looking

3   for is -- would be deemed boilerplate, but the probable

4   cause is not.

5   Q    Okay.  But --

6   A    And just above it in the -- in the dark, where it says

7   the specific address, no, it was an oversight.

8   Q    And going back to your affidavit itself, in support of

9   the search warrant, there are a number of pages talking

10  about your past investigations and what you're -- you know,

11  and things you would expect to find, those were all

12  boilerplate also?

13  A    Are you talking about my -- I guess, just clarify the

14  question.  You're talking about my previous experiences?

15  Q    No, no.  I'm talking about the information within your

16  oath in support of the search warrant, there are some --

17  you know, several pages dealing with past investigation and

18  past -- past knowledge why you would expect to find certain

19  things based upon your experience, but that's boilerplate

20  language, too, also, correct?

21  A    As far as my past experience, I'd have to speak to

22  that of --

23          MR. SALOMON:  Let's go back to the oath in support

24  of the search warrant.  If we can scroll back to that,

25  please.  Okay.  Now, if we can scroll up a little bit,

 1    please.

 2            MS. CASSIDY:  Oh, we'll have to do it.

 3            MR. SALOMON:  Yeah, scroll up a little bit,

 4    please.  Let's -- so I can see the probable cause part.

 5    Q    (BY MR. SALOMON) I noticed right here we have, you

 6    know, what appears to be information concerning this

 7    particular search, and then after "Your affiant knows..."

 8    computer hardware, software and data...instrumentalities,"

 9    that's all boilerplate, though, isn't it?  That's not

10    something you compose just for this instance, is it?

11    A    Where are you talking about?

12    Q    The paragraph, again, in your --

13    A    "Your affiant knows that" --

14    Q    Yeah.

15    A    -- "computer hardware, software and data"?

16    Q    Yeah.  Right there.

17    A    Yeah, it is all accurate information.

18    Q    I understand that.  I asked you if it's boilerplate.

19    A    Yes.

20    Q    Okay.  And as are the following paragraphs?

21    A    We'd have to scroll through.

22    Q    Well, go ahead --

23    A    Some of them --

24    Q    -- and scroll through it.

25    A    Some of them are on --

1  Q    We got plenty of time.

2  A    Some of those are specific to that address.

3  Q    Well, is there something that you added beyond this

4  that wasn't boilerplate?

5  A    On this section?

6  Q    Yes, sir.

7  A    I'd have to read through it.

8  Q    Take your time.

9          MS. CASSIDY:  Mr. Salomon, give him a hard copy.

10         (Off the record.)

11         MR. SALOMON:  We're going to give him a hard copy.

12         MS. CASSIDY:  Is that all right, Your Honor?

13  May I approach?

14         THE COURT:  Yes.  My understanding is Ms. Cassidy

15  is going to approach and provide a hard copy of that search

16  warrant to the witness.

17         THE WITNESS:  So on page 2, where it's numbered

18  1 and 2, "A search warrant return will be filed," that's the

19  specific address of where we are -- what we're searching.

20  Q    (BY MR. SALOMON) I'm sorry?  I couldn't understand.

21  A    Page 2 about three-quarters of the way down --

22  Q    Yeah.  You're talking about some address and --

23  A    Correct.

24  Q    -- that the other --

25  A    That's the difference.

1    Q      -- warrant turned up nothing.

2    A      It's speaking strictly to the oath.  That's it.

3    Q      So everything else is boilerplate?

4    A      Yes.

5    Q      And this -- was there some other oath in support or is

6    this the sole oath that -- information that you presented to

7    the magistrate, the judge?

8    A      That is the oath.

9              MR. SALOMON:  Thank you.

10             MS. CASSIDY:  May I redirect, Your Honor?

11             THE COURT:  Yes.

12                     REDIRECT EXAMINATION

13   BY MS. CASSIDY:

14   Q      Investigator Humphrey, defense counsel, if you'll

15   recall, was asking you about information in your affidavit

16   that was boilerplate in your oath.

17   A      Yes, ma'am.

18   Q      How long did you say you have been working in internet

19   crimes against children?

20   A      Nine years.

21   Q      As part of your experience, have you come to learn that

22   certain crimes might always be used by certain devices?

23   A      Yes, ma'am.

24   Q      Can you elaborate a little bit about that as it relates

25   to internet crimes against children?

1    A    So persons specifically download, view, and share child

2    pornography.  I am used to using the term "child

3    pornography."  CSAM is a newer term in these investigations.

4    So I apologize that I -- I usually say "child pornography."

5    But child pornography persons, when they -- to say that

6    they're all the same would be incorrect.  To say they're all

7    different is incorrect.  They all possess and hold these

8    items near and dear to them because that is their collection

9    of child pornography.  And so if you -- but they're all

10   using electronic equipment.  Some may use a dial-up mode.

11   Some may use high-speed internet.  Some may use a hard drive

12   to store it.  Some may use their phone to store it.  So in

13   order -- when we do these investigations, you may not know

14   which ones are which, so you want to make sure that you are

15   covered on what you're searching.  You're searching for all

16   electronics and that's why.

17   Q    And so you know that these crimes are being committed

18   with electronic devices?

19   A    Yes, ma'am.

20   Q    So is it fair to say that your search is to look for

21   all electronic devices?

22   A    Yes, ma'am.

23   Q    And is that going to be the case in -- I don't want to

24   say "all," but most of your crimes that you're investigating

25   involving internet crimes against children?

1    A    Say that again.  I'm sorry.

2    Q    Is that going to be the case in most of your

3    investigations for internet crimes?

4    A    Yes, ma'am.  When I first started, we were -- most

5    everybody that we dealt with had a tower lap -- tower

6    computer on a desk.  We started moving into laptops.  And

7    then there towards the end, they may use cell phones.  But,

8    like I said, not all are the same, but there are very few

9    differences in them as well.

10   Q    So when defense counsel asked you if this information

11   was boilerplate, is it better to say that this information

12   is standard?

13   A    Yes, ma'am.

14   Q    Thank you.

15          MS. CASSIDY:  Thank you, Your Honor.

16          THE COURT:  May the witness step down?

17          MS. CASSIDY:  Yes, Your Honor.  I apologize.

18          THE COURT:  Thank you.  And is that the last

19   witness for the government?

20          MS. CASSIDY:  Yes, Your Honor.

21          THE COURT:  Okay.  And does the defendant -- do

22   you guys have any witnesses?

23          MR. SALOMON:  No, ma'am.

24          THE COURT:  Okay.  Then it seems to me we can move

25   to argument.

1          MR. SALOMON:  Thank you.  Your Honor, I had a

2   three-part argument.  One I may dispense with that deals

3   with my understanding of how the agency acquired the CSAM

4   information from the warrant -- for the bare bones of the

5   warrant was unclear of how it was developed.  Did not -- he

6   was not aware one way or the other from again the warrant,

7   whether it was downloaded or something from Google or some

8   internet provider that alerted the -- alerted the NC, the

9   national comprehensive, you know, warehousing of the stuff,

10  who, in turn, notifies the police, and that warehousing

11  having been a government agency.  But that was not the case

12  here.  In this instance, it was a software program that

13  simply alerts them whenever -- whenever on this public sites

14  it runs, so that part, apparently, I will abandon.

15          THE COURT:  Okay.  So I want to make sure that

16  we're on the same page, Mr. Salomon.  You're abandoning the

17  argument about the review of the Freenet data being an

18  unreasonable search and seizure?

19          MR. SALOMON:  Yes.

20          THE COURT:  Okay.

21          MR. SALOMON:  Yes.  Since it's accessed publicly,

22  simply via software, that there is nothing unusual about it

23  that you and I can access.

24          THE COURT:  Okay.  So we're --

25          MR. SALOMON:  So when I'm doing with --

1          THE COURT:  So that I understand your argument on

2    the bare bones of the --

3          MR. SALOMON:  Bare bones, yeah.

4          THE COURT:  -- affidavit and the -- are you still

5    proceeding on the staleness?

6          MR. SALOMON:  Yes.

7          THE COURT:  Okay.

8          MR. SALOMON:  Yes.  It's part and parcel.

9      We have one, sort of, long run-on paragraph here

10   detailing the probable cause specific to this particular

11   incident in this particular -- and it recites there was a

12   search at 3012 Deborah Drive which resulted in nothing.

13   There is a mention that over the course of the last three --

14   few months of 2021, there was some CSAM material that's

15   associated with that address, but there is nothing in here

16   indicating any CSAM evidence being associated with the

17   3100 Deborah Drive, apartment 61, address.  There is nothing

18   in here about exactly who accessed this -- these materials

19   at 3012 Deborah Drive.  There is no information contained

20   within here when or how it was accessed.  There is no

21   information about -- of any particularity about when

22   Robert Junior moved and when that might have been in

23   relation to any materials that were found through this

24   algorithm.  Of course, the algorithm itself is not mentioned

25   in any form or fashion.  There is no information in here

1    about how this access to any CSAM information was acquired,

2    from whom, and why there is any connection to this

3    particular address and apartment other than Robert Brown

4    happening to live there, since there is nothing that

5    associates him with any misconduct whatsoever.  He indicated

6    he watches porn.  Well, I don't think that's exactly an

7    exclusive club in the United States, you know, since I

8    believe, you know, millions of people access it.

9          And there is nothing -- there is no admission of

10   anything untoward on his behalf or any misconduct.  And, as

11   it says, there is no additional CSAM activity, you know, on

12   some -- some unspecified date, perhaps in December, perhaps

13   not.

14         As to the staleness argument, there is no specifics and

15   no particularity within the affidavit indicating when any --

16   you know, specifics as to when any of this activity

17   occurred.  Obviously, it was all available.  There is an

18   earlier warrant by Agent Scullin which was quite detailed

19   and -- but this was not supplied to the issuing judge

20   magistrate, this particular entrance -- incidence.  It was

21   not incorporated in any form or fashion.  And it was at all

22   times available.  Hard to argue good faith when you have the

23   information and you don't supply it, when you ignore it,

24   intentionally, unintentionally, casually, or how it may have

25   come about.

1          And, of course, I'd also note that, for some reason,

2    we're searching a different address on Medorah Drive, once

3    again, utilizing boilerplate and I'm sure that's where that

4    came from.  Thank you.

5               THE COURT:  Ms. Cassidy.

6               MS. CASSIDY:  Yes.  Thank you, Your Honor.

7          I did want to briefly address a few of Mr. Salomon's

8    arguments.  Obviously, the government disagrees this is

9    bare bones, but that's the point of having the defense and

10   the government.

11              THE COURT:  And that's what I'll rule on.

12              MS. CASSIDY:  But, Your Honor, Mr. Salomon notes

13   that Agent Scullin's search warrant was very detailed.

14   The difference is Agent Scullin had the benefit of time to

15   prepare that search warrant.  Investigator and now Sergeant

16   Humphrey testified he prepared it in his truck on-site.

17   There was a sense of urgency, because we have a man who is

18   not under arrest, who had access to the home and who could

19   destroy evidence within the apartment.  So I don't think

20   it's fair for the defense to suggest that, "Well, Agent

21   Scullin's affidavit was more detailed.  His should have

22   been, too."

23         But even beyond that, Mr. Salomon suggests that there

24   is no information -- and, hopefully, I wrote it down

25   correctly.  I don't want to misquote him.  But there is no

1    information about who or how the CSAM was viewed at 3012

2    Deborah Drive.  Well, that's exactly the point.  That was

3    the point of the search warrant.  We don't know who inside

4    the home was viewing it.  That's why we obtained the search

5    warrant, to go search the house, find the electronic

6    devices, hope to find some type of characteristics about

7    that device that would link us to the viewer of a time when

8    three people were living inside the home.  So I would

9    completely agree with Mr. Salomon, that there is not that

10   information here, because we don't know it, at the time.

11        What we do know, what is included in this affidavit,

12   is we know that Robert Brown, Jr., was originally living at

13   this home.  And we know that over the last few months of

14   2021, there had been CSAM material being downloaded to this

15   home.

16        We also know that Mr. Brown moved from the home, and

17   after that, based upon this warrant, the CSAM stopped.  I

18   think this is more than sufficient to say there is a link

19   here between Mr. Brown exiting the home and the CSAM

20   material stopping.

21        This affidavit, the oath, identifies the search

22   warrant, as does the warrant itself.  There is a reference

23   to a Medorah Drive address, but agents didn't search

24   Medorah Drive.  They searched 3100 Deborah Drive,

25   apartment 61.  And I did want to make one other argument,

1   Your Honor.  I just have to remember what it was.

2            THE COURT:  Did you want to address staleness?

3            MS. CASSIDY:  Oh, Your Honor, I apologize.  I did

4   want to address just very briefly, on the staleness issue.

5   I cited this in my brief, but the Fifth Circuit held about a

6   six-month delay between the discovery of child pornography

7   and the application of a search warrant doesn't render the

8   warrant stale, and the government argues that's particularly

9   because of technology.  Technology, as Sergeant Humphrey

10  described, these devices are meant to maintain it.  And it's

11  not unreasonable to believe that when Robert Brown, Jr.,

12  left the home, that he would have taken his devices with him

13  to his new location.  And the nature of these types of

14  crimes involve retaining child pornography, making a

15  collection.  And so it was not unreasonable for these agents

16  and it was not unreasonable, according to the Fifth Circuit,

17  to have a search warrant that's executed after the last few

18  months that the CSAM was viewed.

19       Your Honor, I think that addresses everything.  If

20  there is something else the Court would like us to speak on.

21            MR. SALOMON:  I have a brief response, Your Honor,

22  if I might.

23            THE COURT:  Okay.

24            MR. SALOMON:  Looking, once again, at the four

25  corners of the affidavit, there is no indicia -- there is

1    nothing indicating that there was a computer in this

2    apartment at apartment number 61.  There is no computer

3    activity that was noted by anyone that concerns this

4    apartment.  What the warrant says is that they had a search

5    warrant that showed activity at the Deborah Drive address of

6    the parents, that they didn't find anything there, although

7    computers, and then it says, well, we've got a son who

8    watches porn.  We're going to go search this other place.

9    It doesn't indicate that there are any computers, any

10   computer activity, any CSAM activity, since he moved, even

11   though they're not specific as to when he moved.  I know the

12   government indicates that they were in a rush, but not in a

13   rush enough to ask any questions and providing information

14   in this particular instance.  I don't think a rush makes it

15   good faith.

16            THE COURT:  All right.  Thank you both very much.

17   I appreciate all the testimony from the witnesses.  I will

18   take the motion under advisement on the remaining two issues

19   and we will issue a report and recommendation shortly.

20   Thank you all very much.  We are adjourned.

21         (Proceedings concluded at 2:59 p.m.)

22                          CERTIFICATE

23   I hereby certify that the foregoing is a true and correct
     transcript from the record of proceedings in the
24   above-entitled matter.    /s/ Diana Cavenah
                                Official Court Reporter
25